IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

AIDA ESTHER RIVERA-QUIÑONES,
et al.,

    Plaintiffs,

    v.

VICTOR RIVERA-GONZALEZ, et al.,

    Defendants.

CIVIL NO. 03-2326 (RLA)

## ORDER IN THE MATTER OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants have moved the court to enter summary judgment dismissing the claims asserted against them in these proceedings. The court having reviewed the arguments set forth by the parties as well as the documents submitted in support thereof hereby rules as follows.

### BACKGROUND

This action was filed by the relatives of decedent JULIO E. SANTOS RIVERA,[1] seeking damages resulting from his death while under the custody of the Puerto Rico Corrections Administration ("CORRECTIONS ADMIN."). Plaintiffs claim violations to 42 U.S.C. § 1983 for unsafe prison conditions and denial of medical care pursuant to the Fifth, Eighth and Fourteenth Amendments to the U.S. Constitution. Additionally, plaintiffs aver local negligence claims under our supplemental jurisdiction.

---

[1] Named plaintiffs are: decedent's mother, stepfather, siblings and minor children represented by their mother.

**CIVIL NO. 03-2326 (RLA)**                                              **Page 2**

Named defendants are the following individuals occupying the positions listed below at the time of the events giving rise to this litigation:

1.  VICTOR RIVERA GONZALEZ - Administrator of the CORRECTIONS ADMIN.

2.  HECTOR FONTANEZ - Auxiliary Administrator of Security at the Central Office of the CORRECTIONS ADMIN.

3.  AMAURY PEREZ SALAS - Director of the Medical Cadre Program at the CORRECTIONS ADMIN.

4.  JAIME LOPEZ - Director of the Southern Region for the CORRECTIONS ADMIN.

5.  PORFIRIO GREEN - Director of Security for the Southern Region for the CORRECTIONS ADMIN.

6.  WILLIAM TORRES SANTIAGO - Manager of the Ponce Penal Complex.

7.  JORGE SIVESTRINI RUIZ - Director of Security at the Ponce Penal Complex.

8.  SIXTO MARRERO RODRIGUEZ - Superintendent of the Ponce 1000 Institution.

9.  LUIS A ROSADO RODRIGUEZ - Commander of the Guard at the Ponce 1000 Institution.

CIVIL NO. 03-2326 (RLA)                                    **Page 3**

---

10.  SGT. JOSE RAMON LEON FLORES[2] - Shift sergeant at the Ponce

1000 Institution on December 15, 2002 evening.

**SUMMARY JUDGMENT**

Rule 56(c) Fed. R. Civ. P., which sets forth the standard for

ruling on summary judgment motions, in pertinent part provides that

they shall be granted "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as

a matter of law." Sands v. Ridefilm Corp., 212 F.3d 657, 660-61 (1st

Cir. 2000); Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir.

1999).  The party seeking summary judgment must first demonstrate the

absence of a genuine issue of material fact in the record.

DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997).  A genuine

issue exists if there is sufficient evidence supporting the claimed

factual disputes to require a trial.  Morris v. Gov't Dev. Bank of

Puerto Rico, 27 F.3d 746, 748 (1st Cir. 1994); LeBlanc v. Great Am.

Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), *cert. denied*, 511 U.S.

1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). A fact is material if it

might affect the outcome of a lawsuit under the governing law.

Morrissey v. Boston Five Cents Sav. Bank, 54 F.3d 27, 31 (1st Cir.

1995).

---

[2]  The only defendant present at Ponce 1000 Institution at the
time of the alleged events.

**CIVIL NO. 03-2326 (RLA)**                                    **Page 4**

"In ruling on a motion for summary judgment, the court must view 'the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.'" <u>Poulis-Minott v. Smith</u>, 388 F.3d 354, 361 (1st Cir. 2004) (citing <u>Barbour v. Dynamics Research Corp.</u>, 63 F.3d 32, 36 (1st Cir. 1995)).

Credibility issues fall outside the scope of summary judgment. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). *See also*, <u>Dominguez-Cruz v. Suttle Caribe, Inc.</u>, 202 F.3d 424, 432 (1st Cir. 2000) ("court should not engage in credibility assessments."); <u>Simas v. First Citizens' Fed. Credit Union</u>, 170 F.3d 37, 49 (1st Cir. 1999) ("credibility determinations are for the factfinder at trial, not for the court at summary judgment."); <u>Perez-Trujillo v. Volvo Car Corp.</u>, 137 F.3d 50, 54 (1st Cir. 1998) (credibility issues not proper on summary judgment); <u>Molina Quintero v. Caribe G.E. Power Breakers, Inc.</u>, 234 F.Supp.2d 108, 113 (D.P.R. 2002). "There is no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, and no room for the judge to superimpose his own ideas of probability and likelihood. In fact, only if the record, viewed in this manner and without regard to

CIVIL NO. 03-2326 (RLA)                                          **Page 5**

credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment.". <u>Cruz-Baez v. Negron-Irizarry</u>, 360 F.Supp.2d 326, 332 (D.P.R. 2005) (internal citations, brackets and quotation marks omitted).

In cases where the non-movant party bears the ultimate burden of proof, he must present definite and competent evidence to rebut a motion for summary judgment, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 256-257, 106 S.Ct. 2505, 91 L.Ed.2d 202; <u>Navarro v. Pfizer Corp.</u>, 261 F.3d 90, 94 (1st Cir. 2000); <u>Grant's Dairy v. Comm'r of Maine Dep't of Agric.</u>, 232 F.3d 8, 14 (1st Cir. 2000), and cannot rely upon "conclusory allegations, improbable inferences, and unsupported speculation". <u>Lopez-Carrasquillo v. Rubianes</u>, 230 F.3d 409, 412 (1st Cir. 2000); <u>Maldonado-Denis v. Castillo-Rodríguez</u>, 23 F.3d 576, 581 (1st Cir. 1994); <u>Medina-Muñoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990).

### THE FACTS

Decedent was incarcerated at the Ponce 1000 penal institution on May 17, 2002.

According to the Evaluation Form at the time of his admission, decedent indicated that he used crack and alcohol. The social history report also noted that he started using marihuana, crack and cocaine when he was 30 years old. Decedent also stated that he had no enemies at the Institution.

CIVIL NO. 03-2326 (RLA)                                           Page 6

---

In the interview JULIO E. SANTOS RIVERA also reported he had a brother and a half-brother who worked as correctional officers at the CORRECTIONS ADMIN.

### December 15, 2002 Events

According to correctional officer CARLOS JAVIER MEDINA TORRES, on December 15, 2002 at approximately 8:35 p.m., while he was conducting the 9:00 p.m. inmates' recount, he saw decedent standing at his cell door. Decedent seemed "in well health state" (sic).[3]

In an interview carried as part of the investigation surrounding decedent's death, JUAN PAGAN SOTO, a fellow inmate, indicated that at approximately 9:00 p.m. on December 15, 2002, he was preparing a list for purchases at the commissary for the next day. PAGAN SOTO went over to decedent's cell to ask decedent if he wanted to add something to the list but decedent did not answer. Another inmate called out to decedent to try to wake him up because they noticed that decedent's position lying on the bed did not look normal. NESTOR FULLADOSA LOPEZ was then called to come and help.

According to FULLADOSA LOPEZ, he was approached by a fellow inmate at some point after 9:00 p.m. on December 15, 2002, while he was watching television and requested to go check on SANTOS FIGUEROA because decedent was not moving and was unresponsive. FULLADOSA LOPEZ, who had studied medical emergencies, took decedent's pulse and noted it was very slow which lead him to conclude that decedent was

---

[3]  Sworn Statement (docket No. 99-7).

under the effects of a drug overdose. MR. FULLADOSA LOPEZ, along with other inmates attempted to revive SANTOS RIVERA.

MANUEL LEBLANCH LUGO, a correctional officer, indicated that on December 15, 2002 at approximately 9:50 p.m. - while posted on duty with direct vision to decedent's cell - he was called by an inmate who requested that the doors be opened to allow decedent to be taken to the intake area since he was convulsing. Whereupon LEBLANCH LUGO requested the Master Control for an override and various inmates exited carrying decedent and took him to the intake area. This process took approximately three minutes.

While at the intake area FULLADOSA LOPEZ gave decedent mouth-to-mouth resuscitation and a correctional officer pumped decedent's chest trying to revive him. Ice was placed on various parts of decedent's body. Decedent was also taken to the shower but he showed no response.

When decedent was taken to the intake area, DAMARIS BORRERO BORRELI called nurse RAFAEL GARRASTEGUI and notified him of the emergency. A call was put to the Emergency Room located at the Ponce Main penal complex at approximately 9:55 p.m. to send an ambulance. The ambulance arrived at approximately 10:05 p.m. and left at about 10:10 p.m.

DR. ANTHONY MELENDEZ, part of the correctional health staff on duty at the time of the events, stated in his deposition that decedent had no vital signs upon arrival at the Ponce Main Medical

Area. JULIO E. SANTOS RIVERA was pronounced dead on December 15, 2002, at approximately 10:35 p.m.

DR. MELENDEZ further indicated that the distance between Ponce Main Medical Area and Ponce 1000 may be a problem if there are delays in procuring a vehicle to transfer the patient for emergency medical care.

Nurse IRIZARRY, Chief Nurse at the Ponce Complex at the time of the events, testified during her deposition that there are about six to nine monthly cases of drug overdose at the Ponce Complex and at least three cases at Ponce 1000.

According to the report prepared by ROSADO-RODRIGUEZ, Commander of the Guard at the Ponce 1000 Institution, decedent's emergency was notified to Ponce Main at 9:50 p.m. and decedent reached its emergency services at 10:20 p.m.

### Security

The autopsy report certified the cause of death as intoxication by opiates. The document does not note any evidence of violence or trauma.

No violent incident was noticed by LEBLANCH LUGO in decedent's cell prior to being approached by an inmate requesting that the cell doors be opened.

Decedent's body did not have any marks, nor did his clothes reveal any violence.

CIVIL NO. 03-2326 (RLA)                                          **Page 9**

Codefendants ROSADO RODRIGUEZ and LEON FLORES as well as LEBLANCH LUGO saw decedent's body on December 15, 2002 evening and could not identity any marks that would indicate that he was the object of an attack by other inmates prior to the convulsions.

Codefendants LEON FLORES and ROSADO RODRIGUEZ admitted that during routine searches at Ponce 1000 syringes, drugs, contraband and home-made knifes called "shanks" could be found.

In his deposition, codefendant LEON-FLORES, shift sergeant at the time of the events, indicated that the Ponce 1000 Institution had capacity for 1,000 inmates and there was only one officer for every 100 inmates making it impossible to have direct supervision over the inmates. The deponent acknowledged that he was worried that he did not have enough personnel in case a situation arose.

Codefendant MARRERO, Superintendent of Ponce 1000 at the time of the events, stated that since he began working at Ponce 1000 in May 2002, he informed LOPEZ, the Regional Director, of the need for additional officers.

Codefendant ROSADO RODRIGUEZ stated that when he arrived at Ponce 1000 in May 2002 the staffing was not complete.

The only correctional officer with personal knowledge of the events which transpired in the evening of December 15, 2002 is LEBLANCH-LUGO who was posted in the control room. He found out about decedent's condition when the inmates using the voice amplifier

CIVIL NO. 03-2326 (RLA)                                    **Page 10**

system notified him. It was not possible for him to supervise 112 inmates from inside his post in the control room.

There were no security complaints on the part of decedent while incarcerated at Ponce 1000. Codefendants indicated that had they known that plaintiff's security or well-being were at risk or that decedent had asked for a transfer they would have acted accordingly.

### Medical Services

Ponce 1000 is located in the farthest corner of the Ponce Correctional Complex. It has a population of 1,000 adult inmates. The Institution had been previously administered by a private entity which supplied its own in-house emergency medical services. When the contract with the private company ended, the system for providing emergency medical services changed.

On June 5, 2002, SIXTO MARRERO, Superintendent of Adults 1000 was advised that effective June 10, 2002, ambulatory medical services, laboratories, x-rays and distribution of medicines would be provided at Ponce 1000 from 8:00 a.m. to 4:30 p.m. Monday through Friday. Further, the nurse shift from 3:00 p.m. to 7:00 a.m. was to be discontinued. Emergency Services and other related hospital services would be provided only at the Ponce Correctional Complex. In case of emergency outside the regular schedule the inmates were to be taken to the Emergency Room located at the Ponce Main institution.

Effective June 10, 2002, inmates at Ponce 1000 had to be transported to another institution located at the entrance of the

CIVIL NO. 03-2326 (RLA)                                          **Page 11**

Ponce Complex called Ponce Main to receive medical emergency services.

On July 2, 2002, Ponce 1000 Superintendent SIXTO MARRERO wrote to JAIME LOPEZ, Director of the Southern Region, expressing his concern with the reduction in medical services at the Ponce 1000 Institution. The warden was particularly concerned with the fact that there would be no medical services available from 4:30 p.m. until 7:00 a.m. the following day in an institution housing 1,000 inmates. Given the distance from the Ponce Main facilities this could result in permanent damages in case of an emergency medical condition.

Codefendant MARRERO indicated in his deposition that it was foreseeable that overdoses could occur within the penal population which would require prompt medical attention. The superintendent mentioned that he wrote the July 2, 2002 letter because of this problem as well as other medical emergencies which could develop.

Codefendant ROSADO RODRIGUEZ stated that he shared MARRERO's concern regarding the lack of medical services because there were almost 1,000 inmates housed at the Institution and the emergency room at Ponce Main was far away. He noted that it usually took approximately 20-25 minutes from the time an ambulance was requested from Ponce Main to the time the patient reached its medical facilities.

On October 21, 2002, Superintendent MARRERO wrote to WILLIAM TORRES SANTIAGO, Administrator of Ponce 1000 advising of the

CIVIL NO. 03-2326 (RLA)                                          **Page 12**

cancellation of inmates' medical appointments due to insufficient transportation services available.

The report prepared by DR. CARLOS ROBLES RIVERA, plaintiffs' expert witness, indicates that heroin is a derivative of morphine. He opined that as soon as the patient was found showing clinical symptoms of an overdose, it should take no more than 10-15 minutes to provide him with emergency care since after that period of time the patient is under a high risk of brain hypoxia. Further, if adequately treated, only 3% to 7% of these patients require hospitalization since the appropriate treatment is effective and direct. The expert concluded that if treatment is promptly given the risk of death from overdose is very low.

### SECTION 1983 - ELEMENTS

The complaint charges violation of 42 U.S.C. § 1983 which reads:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress.

Section 1983 does not create substantive rights but is rather a procedural mechanism for enforcing constitutional or statutory

rights. Albright v. Oliver, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Hence, it is plaintiffs' burden to identify the particular underlying constitutional or statutory right that is sought to be enforced via judicial proceedings.

In order to prevail in a § 1983 claim plaintiff must bring forth evidence that (1) defendant acted "under color of state law" and (2) deprivation of a federally protected right.[4] Rogan v. City of Boston, 267 F.3d 24 (1st Cir. 2001); Dimarco-Zapa v. Cabanillas, 238 F.3d 25, 33 (1st Cir. 2001); Collins v. Nuzzo, 244 F.3d 246 (1st Cir. 2001); Barreto-Rivera, 168 F.3d at 45.

All parties concede that the defendants were acting within the scope of their duties as state officers at all relevant times. Therefore, the first element is satisfied. We must then ascertain whether decedent was deprived of any federally protected right as a result of the events which culminated in his demise.

---

[4] In this particular case, none of the named plaintiffs personally suffered constitutional deprivations for which reason they may not assert individual § 1983 claims. However, when there is evidence of decedent having suffered as a result of the constitutional deprivation, Puerto Rico law allows for his/her heirs to assert this claim on decedent's behalf. See, i.e., González Rodríguez v. Alvarado, 134 F.Supp.2d 451, 454 (D.P.R. 2001). "As such, [decedent's] son and legal heir, has standing to bring the present § 1983 in his representative capacity.")

Based on the foregoing, JULIO E. SANTOS RIVERA's two children may assert the claims decedent would have brought under this provision but for his untimely death. Art. 736 of the Puerto Rico Civil Code, Laws of P.R. Ann. tit. 31, § 2361 (1993), provides that children inherit from their parents and if there are no children, it will then be the parents who will inherit after their children's death.

### FIFTH AND FOURTEENTH AMENDMENTS

Plaintiffs having failed to address defendants' request to dismiss the claims asserted under the Fifth and Fourteenth Amendments and it appearing that defendants' arguments are legally sound, these claims are hereby **DISMISSED.**

### EIGHTH AMENDMENT

Conditions of confinement and the treatment afforded sentenced prisoners is subject to the Eighth Amendment restraints against "cruel and unusual punishments". Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811, 822 (1994); Giroux v. Somerset County, 178 F.3d 28, 31 (1st Cir. 1999).

Under the Eighth Amendment prison officials must guarantee the safety of prisoners including protection from attacks from fellow inmates. Farmer v. Brennan, 511 U.S. at 833; Calderon-Ortiz v. Laboy, 300 F.3d 60, 64 (1st Cir. 2002); Giroux, 178 F.3d at 32. Additionally, there is a duty to care for a prisoner's "serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); Garcia v. City of Boston, 253 F.3d 147, 150 (1st Cir. 2001).

"A prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Farmer v. Brennan, 511 U.S. at 828 (citations omitted). The deliberate indifference standard is utilized for both safety and medical Eighth Amendment claims. See, Alsina-Ortiz v. Laboy, 400 F.3d 77, 80 (1st Cir. 2005).

**CIVIL NO. 03-2326 (RLA)**                                    **Page 15**

---

### Personal Safety

"[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. at 847.

In *Farmer*, the Supreme Court summarized the two requirements for an Eighth Amendment breach as:

> First, the deprivation alleged must be, objectively, sufficiently serious... For a claim... based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. The second requirement follows from the principle that only the unnecessary and wanton infliction of pain implicates the Eight Amendment... To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind... In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety.

511 U.S. at 834 (citations and internal quotation marks omitted).

Under the "deliberate" requirement the official must be cognizant of circumstances which presuppose that the inmate is subject to substantial risk of serious harm. Burrell, 307 F.3d at 8.

*See also*, Calderon-Ortiz, 300 F.3d at 64 ("plaintiffs must show: (1) the defendant knew of (2) a substantial risk (3) of a serious harm and (4) disregarded that risk"); Giroux, 178 F.3d at 32 (standard requires "an actual, subjective appreciation of risk.")

In support of their claim for lack of adequate security plaintiffs allege decedent's intoxication with illegal drugs resulted from "defendants' failure to provide adequate staffing to supervise the inmates to avoid inmate on inmate assault."[5] In other words, that the drug overdose was administered by other inmates by force. They point to the fact that illegal drugs and syringes were being brought clandestinely into the institution.

Upon reviewing the entire file in this case we have not come across any evidence which lends support to plaintiffs' theory that decedent's overdose resulted from anything but his own volition. There is no indication of foul play in any of the records or testimony submitted by the parties to this case. Neither decedent's body, nor his clothes, cell surroundings or the testimony of the inmates or officers on duty that evening substantiates an inference that decedent was involved in struggle or violence. The autopsy report further confirms this fact. Additionally, plaintiff admitted to the use of drugs in his intake interview.

---

[5]   Opposition to Motion for Summary Judgment (docket No. 11) p. 5.

In sum, in responding to defendants' summary judgment petition plaintiffs have not come forth with any evidence upon which they may rely to establish an Eighth Amendment claim for defendants' deliberate indifference to decedent's safety while in prison which resulted in his death by a drug overdose.

Plaintiffs further allege that additional security measures should have been taken with regard to decedent because he had two relatives who worked as correctional officers. Apart from the fact that there is no evidence of decedent having been subjected to violence, this information is but a passing note in decedent's social history report in response to questions posed regarding his family. At no point did decedent relay any particular fear or concern regarding his safety which would have put defendants on notice of particular safety needs. In fact, decedent specifically denied having any enemies at the Institution.

Accordingly, the Eighth Amendment claim based on the lack of safety for the decedent is hereby **DISMISSED**.

### Medical Needs

The applicable standard for determining whether the conduct at issue rises to a constitutional deprivation level is whether the defendants "acted with deliberate indifference ... to [decedent's] serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); Gaudreault, 923 F.2d at 208; Ferris, 44 F.Supp.2d at 66-7; Jesionowski 937 F.Supp. at 101. "The question

under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health." <u>Farmer</u>, 511 U.S. at 843 (citation and internal quotation marks omitted).

> For medical treatment in prison to offend the constitution, the care must involve acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. Deliberate indifference in this context may be shown by the denial of needed care as punishment and by decisions about medical care made recklessly with actual knowledge of impending harm, easily preventable. Deliberate indifference means that a prison official subjectively must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Therefore, substandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a constitutional violation.

<u>Ruiz-Rosa v. Rullan</u>, 485 F.3d 150, 156 (1st Cir. 2007) (internal citations and quotation marks omitted).

"A medical need is 'serious' if it is... one that is so obvious that even a lay person would easily recognize the necessity for a

CIVIL NO. 03-2326 (RLA)                                              **Page 19**

---

doctor's attention." Gaudreault, 923 F.2d at 208; Ferris, 44 F.Supp.2d at 67; Jesionowski, 937 F.Supp. at 101.

In support of their claim that the deprivation was "sufficiently serious" plaintiffs allege that defendants failed to provide decedent with "adequate access to emergency medical services... [which resulted in] his death from a drug overdose which if treated promptly would not have been deadly".[6] Plaintiffs do not contend that shift sergeant LEON FLORES - the only codefendant present when the emergency arose - in any way purposely delayed or denied decedent access to medical treatment when faced with the emergency situation. Rather, the Eighth Amendment claim is premised on the fact that certain defendants acted with deliberate indifference to decedent's serious medical needs by eliminating in-house medical facilities even though overdoses were common among the inmate population and the delay in reaching alternate medical facilities could prove fatal. In other words, that the absence of emergency medical services at Ponce 1000 posed an excessive risk to the inmates' health and in particular to plaintiff. DR. ROBLES RIVERA, plaintiffs' expert witness, further corroborated this position by highlighting how crucial the time factor was in saving inmates who overdosed.

---

[6]  Opposition to Motion for Summary Judgment (docket No. 111) p. 9.

Based on the limited evidence available in the record,[7] we find that plaintiffs have adequately substantiated their allegation of a sufficiently substantial risk of serious damage to decedent's health due to the lack of emergency care services at Ponce 1000 on December 15, 2002.

We must then proceed to examine the subjective element of the deliberate indifference standard. "Absent evidence of subjective awareness, there could be no 'deliberate indifference' to [plaintiff's] serious medical need." Mahan v. Plymouth County House of Corrections, 64 F.3d 14, 18 (1st Cir. 1995). "Willful blindness and deliberate indifference are not mere negligence; these concepts are directed at a form of scienter in which the official culpably ignores or turns away from what is otherwise apparent." Alsina-Ortiz, 400 F.3d at 82. "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." Farmer, 511 U.S. at 836.

Thus, plaintiffs must show that each individual defendant had sufficient knowledge of the substantial risk to the health of inmates at Ponce 1000 in an emergency situation to trigger responsibility to provide emergency medical services. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane

---

[7]   It must be noted that defendants did not address this particular issue in their memoranda.

conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. Conjectures regarding putative knowledge are not sufficient to establish liability under the Eighth Amendment. *See, i.e.*, Alsina-Ortiz, 400 F.3d at 81 ("As to the 'should have known' claim, negligence is not a basis for liability under the Eighth Amendment theory.")

In support of defendants' subjective awareness plaintiffs note that correctional staff supervisors were aware that inmates had to be transferred to another institution for emergency medical care; there were at least three cases of overdoses at Ponce 1000 per month and Superintendent MARRERO had written a letter voicing his concern that inmates who developed emergency conditions might die and that drug overdoses were foreseeable.

"[S]pecifically, at least since 2 July 2002, six months before Julio's death, codefendants Jaime Lopez, Director of the Southern Region, William Torres, Manager of the Ponce 1000 institution, Sixto Marrero, Warden of the Ponce 1000 institution, and Luis Rosado, commander of the Guard at the Ponce 1000 institution were aware of the substantial risk of harm that faced both the penal population and the correctional staff in the case that someone needed emergency medical services. By the fact that Lopez, as regional director,

responded directly to the Administrator, codefendant Rivera, a reasonable jury could infer that codefendant Victor Rivera[8] also knew about the risk."[9]

Based on the foregoing, we find that there is sufficient evidence for a trier of fact to conclude that codefendants: (1) JAIME LOPEZ, (2) WILLIAM TORRES, (3) SIXTO MARRERO, (4) LUIS ROSADO and (5) VICTOR RIVERA were aware of the substantial risk of harm faced by the Ponce 1000 penal population in case of a medical emergency and that their failure to take action amounted to deliberate indifference to the health of the prisoners housed there which culminated in the death of JULIO E. SANTOS RIVERA.

### QUALIFIED IMMUNITY

Qualified immunity shields officials from having to pay for damages resulting from violations of § 1983 provided certain particular circumstances are present. "The doctrine of qualified immunity 'provides a safe harbor for a wide range of mistaken judgments.'" Kauch v. Dep't for Children, Youth and Their Families, 321 F.3d 1, 4 (1st Cir. 2005) (citing Hatch v. Dep't for Children, Youth and Their Families, 274 F.3d 12, 19 (1st Cir. 2001)).

---

[8] Even though the proffer regarding Rivera is insufficient, we shall hold our ruling regarding him in abeyance pending the taking of his deposition. See, Opposition to Motion for Summary Judgment (docket No. 111) p. 13 n.3.

[9] Opposition to Motion for Summary Judgment (docket No. 111) pp. 12-13.

The court will follow a three-part inquiry in ascertaining whether or not a defendant is entitled to protection. Initially, the court will consider "whether the plaintiff's allegations, if true, establish a constitutional violation." Whalen v. Mass. Trial Court, 397 F.3d 19, 23 (1st Cir. 2005). If so, the court will proceed to determine "whether the right was clearly established at the time of the alleged violation." Id. "Finally, we ask whether a similarly situated reasonable official would have understood that the challenged action violated that right." Id.

Thus, "qualified immunity remains available to defendants who demonstrate that they acted objectively reasonably in applying clearly established law to the specific facts they faced." Burke v. Town of Walpole, 405 F.3d 66, 8 6 (1st cir. 2005). In other words, whether "an objectively reasonable official in the defendants' position would not necessarily have understood that his action violated plaintiff's rights". Whalen, 397 F.3d at 28.

Because qualified immunity is an affirmative defense it is defendant's burden to present evidence of its applicability. Dimarco-Zappa, 238 F.3d at 35.

In support of the qualified immunity defense petitioners initially posit that plaintiffs failed to establish a constitutional violation. Inasmuch as we already disposed of this argument, there is no need to address it again. Additionally, in a conclusory fashion and without any evidentiary support, defendants allege that they are

CIVIL NO. 03-2326 (RLA)                                          **Page 24**

entitled to qualified immunity because their actions were "objectively reasonable acts, and worthy of the qualified immunity protection".[10] We deem this bare attempt totally inadequate and insufficient.[11]

Accordingly the request for qualified immunity is **DENIED**.

### SUPPLEMENTAL CLAIMS

Because a federal cause of action remains outstanding, the petition to dismiss the supplemental claims is **DENIED**.

### CONCLUSION

Based on the foregoing, defendants' Motion for Summary Judgment (docket No. **99**)[12] is disposed of as follows:

- The claims asserted under the Fifth and Fourteenth Amendments to the U.S. Constitution are **DISMISSED**.

- The Eighth Amendment claim based on lack of safety for the decedent is **DISMISSED**.

Judgment shall be entered accordingly.

The only § 1983 claim remaining at this time is for deliberate indifference to the health of the prisoners housed at Ponce 1000 which culminated in the death of JULIO E. SANTOS RIVERA against

---

[10]  Motion for Summary Judgment (docket No. 99) p. 16.

[11]  Defendants do not contend that deliberate indifference to the safety and medical needs of inmates was a clearly established constitutional protection in December 2002 when the events giving rise to this litigation took place.

[12]  See, Opposition (docket No. **111**).

**CIVIL NO. 03-2326 (RLA)**                                        **Page 25**

codefendants: (1) JAIME LOPEZ, (2) WILLIAM TORRES, (3) SIXTO MARRERO,

(4) LUIS ROSADO and (5) VICTOR RIVERA.

IT IS SO ORDERED.

San Juan, Puerto Rico, this 1st day of November, 2007.


                                        S/Raymond L. Acosta
                                     RAYMOND L. ACOSTA
                                United States District Judge